UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARISOL HAMMOND,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>Defendant. | Civil Action No. 13-12-GMS |

## **MEMORANDUM**

### I. INTRODUCTION

The plaintiff Marisol Hammond ("Hammond") filed this action against the defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), on August 5, 2013. (D.I. 9.) Hammond seeks review of the Commissioner's final decision denying her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), and supplemental security income ("SSI") under Title XVI. (D.I. 6 at 30.) Hammond alleges that she has been disabled since June 1, 2006, due to fibromyalgia, degenerative disc disease, osteoarthritis, and osteoporosis. (D.I. 6 at at 152–55, 158–61, 180, 186.) After Hammond's claims were denied at pre-hearing levels, Hammond, her mother, and a vocational expert ("VE") testified at a hearing before Administrative Law Judge ("ALJ") Melvin Benitz on July 1, 2010. (*Id.* at 43-95.) The ALJ issued a decision on September 10, 2010, determining that Hammond was not disabled as defined by the Act. (*Id.* 30–38.) The Appeals Council denied Hammond's request for review, and the Commissioner affirmed the ALJ's decision on February 14, 2012. (*Id.* at 5–11.) Presently before the court are the parties' cross-

motions for summary judgment. For the reasons identified below, the court will deny Hammond's motion (D.I. 9) and grant the Commissioner's motion. (D.I. 11.)

## II. BACKGROUND

Hammond seeks disability benefits for a period starting June 1, 2006. (D.I. 6 at 152–55.) Hammond has not been gainfully employed since 2002, but she worked for short periods of time between 2002 and the alleged onset date in 2006. (*Id.* at 75–76.) Hammond reportedly has had chronic joint pain since she was sixteen years old, with progressively worsening symptoms. (*Id.* at 301.) Hammond has been diagnosed with fibromyalgia, degenerative disc disease, osteoarthritis, and osteoporosis. (*Id.* at 152–55, 158–61, 180, 186, 375). Additionally, as a consequence of her physical pain, Hammond's discomfort makes her forgetful and unable to maintain concentration. (*Id.* at 71.) Hammond filed for disability when she was twenty-eight years old. (*Id.* at 77.) She has a college education and can speak English. (*Id.* at 62.)

### A. Medical History

#### 1. Mental Impairments

Hammond asserts that her chronic pain makes her forgetful and unable to concentrate on tasks. Hammond reportedly has trouble remembering to do things such as take her medication or take her daughter to Girl Scout meetings. (*Id.* at 87.) She is only able to maintain concentration on tasks and work-related activities for thirty to forty minutes at a time on a "good day," and only five to ten minutes on a "bad day." (*Id.* at 199.) Hammond has difficulty following spoken directions but can follow written directions well. (*Id.*) Hammond is also on medication for depression. (*Id.* at 71.)

## 2. Physical Impairments

Hammond asserts that she is unable to work because of her chronic pain and fatigue. Hammond has been diagnosed with fibromyalgia, osteoarthritis, degenerative disc disease, and osteoporosis. (*Id.* at 152–55, 158–61, 180, 186, 375.) Hammond complains of severe, constant pain, and notes that she has trouble sleeping because of her discomfort. (*Id.* at 48.)

Hammond began visiting a pain management specialist Dr. Michael April, monthly, starting October 25, 2006, through May 24, 2010. (*Id.* at 323–49, 520–59, 580–84.) Hammond's goal was to decrease her reliance on pain medication.[1] (*Id.* at 324, 328, 330–31, 333, 346.) Hammond reported that her pain level improved after starting prolotherapy and radiofrequency neurotomy treatments. (*Id.* at 324, 338, 340–41, 344.) At a November 2007 visit, Hammond also informed Dr. April that her neuropathic symptoms had "nearly resolved." (*Id.* at 334.) Dr. April's notes also indicated that Hammond was improving. (*Id.* at 325, 333–34, 346.) When Hammond reported continued knee pain, Dr. April ordered an x-ray. (*Id.* at 349.) The image did not reveal osteoarthritis in her knees. (*Id.*)

Dr. April completed two Medical Source Statement ("MSS") forms, on July 3, 2008, and May 24, 2010. (*Id.* at 358–62, 143–46.) In the 2008 MMS form, Dr. April diagnosed Hammond with fibromyalgia, generalized joint pain/osteoarthritis in the knees, osteoporosis, and lumbar degenerative disc disease. (*Id.* at 358.) Dr. April opined that Hammond could sit for three hours, stand or walk for three hours, frequently lift and carry up to five pounds, occasionally lift and carry five to ten pounds, but could not stoop, kneel, or pull. (*Id.* at 359.) Dr. April also recommended that Hammond avoid extreme temperatures, humidity, and heights. (*Id.* at 360.)

---

[1] Hammond often self-medicated by increasing her dosage in times of "significant pain." (*Id.* at 542.) At one point, she was taking up to twelve oxycodone pills per day. (*Id.* at 558.)

3

Dr. April concluded that Hammond could not perform full-time work on a competitive basis and that she would be absent at least three times per month. (*Id.* at 360-61.)

Dr. April's 2010 MMS form noted that Hammond continued to have diagnoses of fibromyalgia, osteoporosis, and osteoarthritis of the hands. (*Id.* at 143.) Dr. April indicated that Hammond could sit up to two hours a day, stand/walk up to two hours a day, and occasionally lift ten pounds. (*Id.* at 144.) Again, Dr. April stated that Hammond needed to avoid wetness, temperature extremes, heights, and that she could not stoop, kneel, or bend. (*Id.* at 145.) Dr. April also opined that Hammond had limitations in repetitive reaching, handling, fingering, and lifting, and needed to keep her neck in a constant position. (*Id.* at 144.) Dr. April reiterated her opinion that Hammond could not hold a full-time job on a competitive basis. (*Id.* at 145.)

Hammond also sought treatment from internist Dr. Jeffrey Hoeck, starting in November 2006. (*Id.* at 301.) Dr. Hoeck observed that Hammond had a normal thyroid, positive pressure points, and a supple neck. (*Id.*) He also noted that Hammond was alert and oriented but also that she seemed somewhat sad. (*Id.*) Dr. Hoeck diagnosed Hammond with fibromyalgia. (*Id.*) He tested Hammond for lupus and rheumatoid arthritis; both tests came back negative. (*Id.* at 291.) In June 2007, further tests revealed no jugular venous distention, adenopathy, thyromegaly, carotid bruit, or pretibial edema. (*Id.* at 304.) Hammond did have mild symmetrical hand tremors, but she showed no evidence of deep vein thrombosis. (*Id.*) She had normal pulses, and an abdominal exam revealed no other issues. (*Id.*)

Later that year, in November 2007, Hammond returned to Dr. Hoeck, complaining of multiple rib fractures. (*Id.* at 308.) Though her bone mass was low, her other bone density tests were normal. (*Id.*) Dr. Hoeck diagnosed Hammond with osteopenia and recommended that she cease smoking, engage in weight-bearing exercise and balance training, and take calcium,

4

vitamin D, and Fosamax. (*Id.* at 308.) In March 2008, Hammond again sought treatment due to pain throughout her body, but particularly in her hands. (*Id.* at 311.) Dr. Hoeck found that Hammond did not exhibit hot joints in the hands, swan neck deformities, rheumatoid nodules, or evidence of psoriasis. (*Id.*) Dr. Hoeck referred Hammond to a rheumatologist. (*Id.*)

Hammond received treatment from rheumatologist Dr. Jose Pando six times from December 10, 2009, through May 27, 2010. Dr. Pando's examinations show that Hammond was alert, well groomed, and calm. (*Id.* at 365.) The examinations also showed that Hammond had normal abdominal, cardiovascular, thyroid, eye, peripheral vascular, and chest and lung exams. (*Id.* at 365, 371, 373, 381, 384.) Dr. Pando's notes indicated that Hammond had a normal attention span and demonstrated ability to concentrate. (*Id.* at 365, 371.) Hammond did exhibit mild swelling, moderate tenderness, and pain with decreased range of motion in her hands. (*Id.* at 365, 371.) Though Hammond's bone density study showed osteopenia, and lab results found positive Lyme antibody, there was no indication of inflammation, and x-rays showed only mild osteoarthritis in her hands. (*Id.* at 368, 371.)

Another pain management doctor Dr. Robert Lyles performed several neurotomy procedures, nerve blocks, injections, and guided tenotomy of Hammond's knees between June 30, 2006, and April 6, 2010. (*Id.* at 446-72, 482-85, 493-519, 560-79.) Dr. Lyles noted that these procedures provided Hammond short-term pain relief. (*Id.* at 477.)

At the request of the Social Security Administration, three agency physicians reviewed Hammond's medical records. Dr. Shital Patel reviewed Hammond's medical records on May 21, 2009. (*Id.* at 350–55.) Dr. Patel concluded that Hammond could perform sedentary work with occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (*Id.* at 352.) Dr. A. Aldridge reviewed Hammond's medical records on September 15, 2009. (*Id.*

5

at 356.) Dr. Aldridge opined that benefits should be denied because Hammond did not submit sufficient medical evidence of disability, nor did she respond to a request for a consultative examination. (*Id.*) Finally, Dr. Kuman Swami reviewed Hammond's records on September 25, 2009. (*Id.* at 357.) Like Dr. Aldridge, Dr. Swami had difficulty reviewing Hammond's record because there were no detailed physical examinations documented by a treating physician in the report. (*Id.*) Dr. Swami referred to the examinations in the report as "meager." (*Id.*)

## B. ALJ Hearing

### 1. Hammond Testimony

Hammond, her mother, and VE testified in front of the ALJ on July 1, 2010. (*Id.* at 43–95.) Hammond has a Bachelor's degree in animal sciences. (*Id.* at 62.) Hammond testified to working approximately twenty jobs over a fourteen-year period, including, *inter alia*: animal care attendant, hostess, laboratory technician, junior scientist, kennel assistant, cattle showperson, biological research laboratory technician, and pet sitter. (*Id.* at 36, 89.) Hammond testified that she was unable to keep a job because she would miss too many days for doctor's appointments and because of pain. (*Id.* at 74–76.)

Because of her impairments, Hammond's parents stay with her and her daughter for approximately two weeks every month. (*Id.* at 51.) Hammond's mother cooks meals to last all week so that Hammond can easily reheat them after she leaves. (*Id.* at 51.) Both parents help with general housework. (*Id.*) Hammond testified that she is separated from her husband, but he helps with repairs around the house and remains a big part of their daughter's life. (*Id.* at 52.) Hammond testified that her physical impairments—sensitivity to touch, fatigue, etc.—contributed to her marriage problems. (*Id.* at 58-59.) Hammond is able to drive her daughter to Girl Scout meetings but is unable to stay because she cannot sit for the duration of the meetings,

6

which are approximately an hour to an hour and a half long. (*Id.* at 50.) Furthermore, Hammond asserted that she can only drive for short amounts of time because it aggravates the pain in her hands, neck, and knees. (*Id.* at 52.)

On a pain scale of zero to ten, with ten being the highest, Hammond characterized the daily pain in her back, neck, shoulders, elbows, hands, and wrists as a "five." (*Id.* at 53–55.) Sitting, driving, walking, grabbing, and holding tend to exacerbate her pain. (*Id.* at 53, 55.) Hammond rarely leaves the house without a heating pad, which helps to alleviate her pain. (*Id.* at 56.) Hammond also occasionally uses a cane to assist her walking. (*Id.* at 56–57.) The following are among the medications Hammond takes to alleviate her symptoms: Minocycline for inflammation in her hands and feet; Armour Thyroid for her thyroid; MS-Contin for long-term pain; Roxicodone for pain; Lyrica for fibromyalgia; spironolactone for swelling in hands, legs and feet; Naprosyn for inflammation; prednisone; Lidoderm patch for surface pain; Xyrem for sleep; and Tryptophan for depression. (*Id.* at 68-71.) Hammond also undergoes additional treatments including: injections into her shoulders and scapula once per month; pulsed radiofrequency neurotomy, prolotherapy on her back and knees, and plasma regenerative therapy on her knees six or more times per year; myofascial massage and heating therapy three times per week; and water therapy two or three times per week. (*Id.* at 65–67.)

Hammond testified that her activities of daily living ("ADLs") include laundry, light housework, preparing simple meals, taking out the garbage, and taking care of her daughter and three pets. (*Id.* at 67–68, 73.)

### 2. Witness Testimony

Hammond's mother Terry Ponte also testified at the ALJ hearing. Ms. Ponte testified that she cooks, cleans, and does laundry when she stays at Hammond's house. (*Id.* at 82.) Ms.

Ponte claims that she has been helping her daughter for "quite some time," including when Hammond first got married and before her daughter was born. (*Id.* at 83.) Ms. Ponte frequently drives Hammond to Maryland for doctor's appointments, which she describes as all-day events. (*Id.* at 86.) Because of Hammond's pain, she has to lie down in the back seat with heating pads and pain medication. (*Id.*) Ms. Ponte believes that Hammond's knee and hand pain have worsened since her pregnancy and that Hammond is becoming more forgetful. (*Id.* at 86, 87.)

### 3. Vocational Expert Testimony

Finally, vocational expert Mitchell Schmidt testified at the ALJ hearing. Mr. Schmidt acknowledged Hammond's diverse work history but reasoned that only her jobs of animal caretaker and junior scientist/lab assistant qualified as substantial gainful activity. (*Id.* at 90–91.) The VE classified "animal caretaker" as a medium-duty, semi-skilled job at specific vocational preparation ("SVP") level 4 and "junior scientist"/"laboratory assistant" as a light duty, semi-skilled job at SVP level 4.[2] (*Id.* at 90.) Mr. Schmidt opined that Hammond would not be able to return to her former occupations. (*Id.* at 94.) The VE testified, however, that a hypothetical person in Hammond's position would be able to hold SVP level 2 sedentary, unskilled jobs such as: surveillance systems monitor, food and beverage order clerk, and call-out operator.[3] (*Id.* at 92–93.)

### 4. ALJ Determination

Following the hearing, the ALJ determined that Hammond was not disabled. (*Id.* at 30–38.) The ALJ concluded that Hammond had two severe impairments: fibromyalgia and

---

[2] SVP refers to "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." 20 C.F.R. § 656.3. In particular, a person with an SVP level 4 occupation would require "over 3 months and up to 6 months" to become familiar with the job requirements. *Id.*

[3] SVP level 2 refers to "[a]nything beyond short demonstration up to and including 30 days." 20 C.F.R. § 656.3.

8

degenerative disc disease of the spine. (*Id.* at 33.) The ALJ, however, found that these injuries were not of listing-level severity impairment because Hammond did not require an assistive device, nor is she significantly impaired in her movement. (*Id.*) The ALJ gave strong weight to the opinions of both Drs. April and Patel, but ultimately adopted the opinion of Dr. Patel that Hammond could work. Although Hammond could not perform her old jobs, the ALJ determined that she had the residual functional capacity ("RFC") to perform sedentary work involving unskilled, non-repetitive tasks, which only require low concentration and memory. (*Id.* at 36.) The ALJ determined that there were jobs in the national and local economies that Hammond could perform, including a food and beverage order clerk, a call-out operator, and a surveillance system monitor. (*Id.* at 37.)

## III. STANDARD OF REVIEW

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992); *see also Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, [the court is] bound by those findings, even if [it] would have decided the factual issue differently.") "Substantial evidence" means more than "a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The inquiry is not whether the reviewing court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

9

## IV. DISCUSSION

Hammond seeks review of the ALJ's decision on two grounds. (D.I. 10 at 8.) First, Hammond argues that the ALJ committed legal error for not accounting for all of the functional limitations stemming from Hammond's impairments. (*Id.*) Second, Hammond contends that the ALJ failed to properly analyze the medical records and, by doing so, did not give appropriate deference to the opinions of Hammond's treating source Dr. April. (*Id.* at 14.)

### A. Applicable Statute and Law

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner has promulgated regulations for determining disability by application of a five-step sequential analysis. *See* 20 C.F.R. § 404.1520. The ALJ, the reviewing Appeals Council, and the Commissioner evaluate each case according to this five-step process until a finding of "disabled" or "not disabled" is obtained. *See* § 404.1520(a). The process is summarized as follows:

1. If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."
2. If the claimant does not suffer from a "severe impairment," he will be found "not disabled."
3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, *and* has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."
4. If the claimant can still perform work he has done in the past ("past relevant work") despite the severe impairment, he will be found "not disabled."
5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not he or she is capable of performing other work in the national economy. If he or she is incapable, a finding of disability will be entered. Conversely if the claimant can perform other work, he will be found "not disabled."

§ 404.1520(b)–(f); *see also Carey v. Astrue*, No. 10-413-GMS, 2015 WL 1467205, at *6 (D. Del. Mar. 30, 2015) (paraphrasing the five-step process for determining disability).

The disability determination analysis involves a shifting burden of proof. *See Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983). In the first four steps of the analysis, the burden is on the claimant to prove every element of his or her claim by a preponderance of the evidence. *Sykes v. Apfel*, 228 F.3d 259, 262–63 (3d Cir. 2000). At step five, however, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment the claimant is able to perform. *See id.*; *see also Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1983); *Olsen v. Schweiker*, 703 F.2d 751, 753 (3d Cir. 1983). Substantial gainful employment is defined as "work that—(a) involves doing significant or productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. When determining whether substantial gainful employment is available, the ALJ is not limited to consideration of the claimant's prior work, but may also consider any other substantial gainful activity that exists in the national economy. *See* 42 U.S.C. § 423(d)(1)(A), (2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

### B. Assessment of Functional Limitations

Hammond contends that the ALJ did not account for all of Hammond's functional limitations stemming from her impairments. RFC is a medical assessment of what a claimant can do in a work environment, notwithstanding the functional limitations caused by her severe impairments. 20 C.F.R. §§ 404.1545(a), 404.1546; *Fargnoli*, 246 F.3d at 41. Evidence elicited from medical records, descriptions of limitations by the claimant, and observations from medical examiners or other third parties may all figure into one's RFC, but ultimately the ALJ possesses the sole responsibility to make the assessment. 20 C.F.R. § 404.1545(a).

11

Hammond first contends that the ALJ had a "fundamental lack of appreciation" for Hammond's fibromyalgia symptomology. (D.I. 10 at 8–13.) In challenging the ALJ ruling, Hammond relies heavily on a Social Security Regulation setting forth particular guidelines for ALJ determination for DIB and SSI claims involving fibromyalgia. *See* SSR 12-2p, 2012 WL 3104869 (July 25, 2012). The guidelines outlined in SSR 12-2p, however, became effective July 25, 2012, five months after the present case had been affirmed by the Commissioner. SSR 12-2p *1. The ALJ could not have applied guidelines that were not yet in place. Thus, to the extent that Hammond seeks remand for the ALJ's failure to follow SSR 12-2p, the court rejects her request. *See Dry v. Comm'r, Social Sec. Admin.*, No. SAG-13-3168, 2014 WL 6983402, at *2 (D. Md. Dec. 9, 2014) (finding that remand was necessary when the effective date, July 25, 2012, was in between the ALJ opinion and decision of the Appeals Council); *Harris v. Comm'r, Social Sec.*, No. GLR-14-2220, 2015 WL 1036029, at *2 (D. Md. Mar. 9, 2015) (holding that remand was necessary only because SSR 12-2p was effective while the plaintiff's claims were pending before the Appeals Council).

Moreover, the court finds no error in the ALJ's RFC analysis. Hammond's two prior gainful occupations were junior scientist and animal caretaker, both of which were semi-skilled, SVP level 4 jobs. (D.I. 6 at 90.) These occupations required Hammond to constantly be on her feet, lift and carry up to 100 pounds, and sit for long periods of time. (*Id.* at 63–64, 188.) Hammond testified that she could no longer sit or stand for prolonged periods of time, lift more than ten pounds, or pull, handle, or grab due to hand pain. (*Id.* at 61, 80, 199.) Consequently, the ALJ acknowledged that Hammond could not return to her previous work. (*Id.* at 36.) But with Hammond's limitations in mind, the ALJ determined that Hammond could still work if she alternated sitting and standing at a sedentary, routine, and unskilled job. (*Id.* at 92.)

The ALJ further accommodated Hammond's restrictions by ruling out jobs with repetitive neck turning, fingering, or gripping. (*Id.*) The ALJ recommended work where Hammond could lift less than ten pounds frequently. (*Id.*) The occupations that met the ALJ's description were entry-level, unskilled jobs that did not require prerequisite employment, vocational training, or educational requirements. (*Id.* at 92–93.) In fact, the ALJ purposely requested occupations that were low-memory and low-concentration to accommodate Hammond's pain and discomfort, but ultimately determined that Hammond could still handle tasks and complete schedules by examining her medical record as a whole. (*Id.* at 92.) For example, Hammond reported improvement through exercise and therapies including trigger point injections, epidural steroid injections, nerve blocks, prolotherapy, and radio frequency neurotomy. (*Id.* at 323–24, 327, 329, 333–34, 338, 340–41, 344, 346.) Hammond also responded well to medication and was able to complete ADLs including taking care of her daughter and pets, preparing meals, performing light housework, driving a car, shopping and practicing yoga. (*Id.* at 51–52, 61, 194–96.)

Hammond appears to take issue with the relative brevity of the ALJ's summary of her medical history. But the ALJ is not obligated to recite every piece of medical evidence in his summary. The court is persuaded that the ALJ properly accounted for Hammond's limitations and that there is substantial evidence in the record to support the ALJ RFC determination. The court also agrees with the Commissioner that the ALJ did not err in determining that Hammond's remaining impairments—in addition to fibromyalgia and degenerative disc disease—were not severe. While the severity standard may not be a demanding one, the claimant must provide evidence of at least some effect on her "ability to do basic work activities." *See McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360–61 (3d Cir. 2004). For her other impairments,

13

Hammond did not cite any such evidence to the court. As stated above, the burden is on the claimant to establish severity. *See Sykes*, 228 F.3d 262–63.

The court sees no error in the ALJ consideration of Hammond's impairments. As such, there is substantial evidence in support of the ALJ's RFC determination.

## C. **Weight Afforded to Physicians**

Hammond asserts that the ALJ erred in not giving proper weight to Hammond's treating physician, Dr. April. The ALJ uses medical sources, "including [the] treating source, to provide evidence, including opinions, on the nature and severity of [plaintiff's] impairments." 20 C.F.R. § 1527(d)(2). Generally, the ALJ is required to give more weight to opinions from treating sources, but will give controlling weight only if it finds that "the treating source's opinion on the issue(s) of the nature and severity of [plaintiff's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [plaintiff's] case record." 20 C.F.R. § 1527(c)(2); *see also Brown v. Astrue*, 624 F.3d 193, 196 (3d Cir. 2011) (noting that a treating physician's opinion may be outweighed by other evidence). Furthermore, an ALJ may give great weight to a portion of a medical source opinion, without "adopt[ing] it wholesale." *Lambert-Newsome v. Astrue*, No. 11-1141-CJP, 2012 WL 2922717, at *6 (S.D. Ill. July 17, 2012.) Here, because the ALJ did not afford the treating source controlling weight, he was obligated to explain his decision to give the weight to other sources. *See* 20 C.F.R. § 404.1527(e)(2)(ii).

The ALJ relied primarily on the opinions of Dr. April and state agent Dr. Patel in assessing Hammond's disability status.[4] Dr. April opined that Hammond would not be able to

---

[4] The ALJ noted that neither Dr. Aldridge nor Dr. Swami, both state agency physicians, were able to comment on Hammond's impairments or complete an RFC because both doctors indicated that there was insufficient documentation. (*Id.* at 356, 357.) Further, Dr. Swami noted that the physical examinations he was able to inspect were "meager." (*Id.* at 357.)

14

sustain full-time work activity and that she would be absent from work at least three days of each month due to chronic pain and fatigue. (*Id.* at 361, 377–78.) Dr. Patel, however, opined that Hammond *was* capable of sedentary work because she could sit for six hours, stand or walk for two hours, and occasionally lift ten pounds. (*Id.* at 351.)

The ALJ discounted Dr. April's opinion concerning Hammond's ability to work—even though he was a non-examining physician—because it was inconsistent with the rest of the medical evidence, including Dr. April's own treatment notes. For instance, records show that Hammond improved through exercise and various therapies including trigger point injections, epidural steroid injections, nerve blocks, prolotherapy, and radio frequency neurotomy. (*Id.* at 323–24, 327, 329, 333–34, 338, 340–41, 344, 346.) And a whole host of different tests and exams did not reveal any additional abnormalities. (*Id.* at 291, 308, 371.)

Furthermore, Dr. Hoeck found that Hammond did not have rheumatoid nodules or evidence of psoriasis, hot joints in the hands, swan neck deformities, or ulnar deviation. (*Id.* at 311.) In fact, Dr. Hoeck discouraged Hammond from filing for disability and recommended she find part-time work. (*Id.* at 301–02.) Finally, Dr. Pando indicated normal examinations except for moderate tenderness, pain with decreased range of motion, and mild swelling in Hammond's hands. (*Id.* at 365, 368, 371, 373, 381, 384.) The ALJ's decision to discount Dr. April's opinion because it was was inconsistent with the remainder of Hammond's medical records was supported by substantial evidence. As a result, the ALJ's endorsement of Dr. Patel's opinion was not erroneous. (*Id.* at 35–36.)

## V. CONCLUSION

For the foregoing reasons, this court will deny Hammond's motion for summary judgment and grant the Commissioner's motion.

Dated: July 17, 2015

_____
UNITED STATES DISTRICT JUDGE